# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ADAMS HOUSING, LLC     *
                           *

v.                              *     Civil No. JFM-15-1011

THE CITY OF SALISBURY, MARYLAND   *
                             ******

## MEMORANDUM

Plaintiff Adams Housing, LLC ("Adams Housing") brings suit against the City of Salisbury ("Salisbury") seeking to invalidate a city zoning ordinance and alleging tortious interference with contract. The case is ripe for declaratory judgment.[1] For the reasons set forth below, I find the city zoning ordinance unconstitutionally vague as-applied to Adams Housing.

## BACKGROUND

The instant dispute originates in the city of Salisbury, Maryland. Adams Housing, a limited liability corporation headquartered in Salisbury, owns a variety of rental properties there. (ECF No. 1, ¶ 6). The current suit concerns an Adams Housing rental property located at 418 W. College Avenue, Salisbury ("the Property"), which Adams Housing describes as "a 1.5 story, 2-bathroom, detached, 1,615 square foot house, with a finished basement." *Id.* at ¶ 7. The Property falls within the boundaries of Salisbury District R-10 ("R-10"), which Salisbury labels a "residence district." *Id.* at ¶ 10. Dwelling units in R-10 are subject to single-family zoning, which means tenants must be classified as either a "family" or "functional family" to live in R-10

---

[1] I conducted a call with Adams Housing and Salisbury's counsel on September 24, 2015, where both parties agreed the facts of the case were undisputed and discovery was unnecessary. On the call, both parties consented to the issuance of a final opinion; however, on October 8, 2015, defendant's counsel wrote a letter requesting the court move forward with discovery if I denied defendant's motion for dismiss.

1

under Salisbury's Municipal Code. Salisbury, Maryland, Municipal Code §§ 15.24.1610(A)–(B); 15.24.1620.

In December 2002, Salisbury, responding to the overcrowding of residence districts, enacted an Occupancy Ordinance. The Occupancy Ordinance restricted the definition of families in R-10 dwelling units to (a) groups of related persons; and (b) "not more than four unrelated individuals." *Id.* at ¶ 11. In 2006, Salisbury further narrowed the number of unrelated individuals permitted to qualify as a family in a R-10 dwelling unit to a maximum of "two unrelated persons." Salisbury, Maryland, Municipal Code § 15.24.1610(A)–(B).

If tenants did not qualify as a family under the new Occupancy Ordinance, owners of properties with pre-existing non-conforming uses could apply to be grandfathered in as permissible non-conforming uses. *See* Salisbury, Maryland, Municipal Code § 15.24.1610(A). Similarly, a group of four or fewer people could apply to the Salisbury Department of Neighborhood Services and Code Compliance to be considered a "functional family."[2] As a result of these regulatory accommodations, Adams Housing alleges that there are more "non-confirming" rental properties on the 400 block of W. College Ave. then there are "conforming" properties. (ECF No. 1, ¶ 13).

---

[2] The regulation required each of the following criteria:

    A. Share a permanent personal bond and commitment to one another;
    B. Not dependent upon or supported by someone who does not maintain legal domicile at the particular dwelling unit and reside therein;
    C. Maintain legal domicile at the particular dwelling unit;
    D. Share a single household budget;
    E. Share in the repair and maintenance of the dwelling unit and its grounds, if any;
    F. Prepare and eat meals together on a regular basis;
    G. Share in legal ownership or tenancy of the dwelling unit, as evidenced on a deed or lease.

Salisbury, Maryland, Municipal Code § 15.24.1620.

In July 2014, Adams Housing signed a renewable one-year lease at the Property with three tenants ("the tenants")–two brothers and a lifelong friend of the brothers. (ECF No. 1 at ¶ 14). Each tenant occupied his own bedroom in the house. Adams Housing describes the tenants as "good neighbors" and reports the tenants stayed out of trouble. *Id.*

On September 26, 2014, a Salisbury Code Enforcement Officer issued an "Order to Reduce Occupancy" for the Property. *Id.* at ¶ 15. The officer cited Adams Housing and the tenants for a violation of the Occupancy Ordinance, Salisbury Municipal Code §§ 15.24.490(1)(a) and 15.24.490(1)(b)(i)(A). Specifically, the officer determined the tenants did not meet the Municipal Code's definition of "family" because there were more than "two unrelated persons" living at the Property. Section 15.24.490(1) provides, in relevant part:

"Family" means and includes, subject to the exceptions stated below:

1. A core consists of one person living alone or one of the following groups living as a single housekeeping unit:

    (a) Two or more persons who are related . . .

    (b) Up to a maximum of four persons who are not so related, hereinafter referred to as "unrelated persons" provided, however that:

    > (i)(A) Any existing lawful occupancy in any dwelling or dwelling unit, including an apartment, in an R-5, R-8 or R-10 district, or in Spring Chase PRD No. 1, *the maximum shall be two unrelated persons*, not including the children of either of them, after December 16, 2002 . . . .

(emphasis added). The order indicated a failure to comply could result in a municipal infraction citation, and up to a $500 initial fine, which could increase in the future. (ECF No. 1, ¶ 16).

Following the order, Adams Housing filed an appeal with the Salisbury Housing Board of Adjustments and Appeals ("HBAA"). The HBAA heard the appeal on February 9, 2015. In addition to asking the HBAA to overturn the Code Enforcement Officer's interpretation of more

than "two unrelated persons," Adams Housing also asked the HBAA to determine the tenants were a "functional family" under § 15.24.1620. (ECF No. 1, ¶ 30). The HBAA upheld the Code Enforcement Officer's order and ruled that the tenants did not qualify as a "functional family." *Id.* at ¶¶ 17, 30. The HBAA allowed the tenants to remain at the Property until the end of their lease–July 2015. The HBAA formalized its decision in a March 2, 2015 letter to Adams Housing. *Id.* at ¶ 18.

Exercising its appeal rights under Md. Rule 7–201 and Salisbury Municipal Code § 15.24.450, Adams Housing filed a petition for judicial review of the HBAA's decision in Wicomico County Circuit Court on February 27, 2015. (*See generally* ECF No. 17, Ex. 7).

Shortly thereafter, on April 8, 2015, Adams Housing filed a complaint in this court seeking declaratory relief and punitive damages. (*See generally* ECF No. 1). Adams Housing brings four claims: (1) the Occupancy Ordinance is facially unconstitutional under the Due Process and Equal Protection Clauses of the Constitution; (2) the Occupancy Ordinance is unconstitutional as-applied to Adams Housing under the Due Process and Equal Protection Clauses of the Constitution and the Maryland Declaration of Rights;[3] (3) the Occupancy Ordinance is unconstitutionally vague; and (4) Salisbury's conduct constituted tortious interference with contract. *Id.* For the first three counts, Adams Housing seeks declaratory judgment. *Id.* at ¶¶ 20, 32, 39. For the last, it seeks punitive damages. *Id.* at ¶ 45.

On May 26, 2015, Adams Housing filed an unopposed motion to stay state court proceedings while federal court proceedings continued. (ECF No. 17, Ex. 6, p. 2). The state

---

[3] For its facial constitutional claim, Adams Housing challenges the Occupancy Ordinance's prohibition on more than two unrelated persons living together. (*See generally* ECF No. 1, ¶¶ 19–26). For its as-applied constitutional challenge, Adams Housing challenges the same prohibition and the Occupancy Ordinance's definition and criteria for a "functional family." (*See generally id.* ¶¶ 27–32).

4

court granted the motion. In federal court, on June 18, 2015, Salisbury filed a motion to dismiss all claims in the complaint, to which Adams Housing responded. (ECF Nos. 17, 18). Briefing on the motion concluded when Salisbury filed a reply. (ECF No. 19).

## ANALYSIS

### I. Facial Due Process and Equal Protection Challenge

The court dismisses Adams Housing's first claim–a facial Due Process and Equal Protection challenge to the Occupancy Ordinance's prohibition on no more than "two unrelated persons" living together in district R-10 single-family dwelling units. Adams Housing fails to state a Due Process or Equal Protection claim because the Occupancy Ordinance comfortably clears the hurdle of rational basis scrutiny.

Facial challenges are "the most difficult challenge[s] to mount successfully, since the challenger must establish that no set of circumstances exists under which the [legislation] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As the Supreme Court has long held, zoning is an exercise of a local government's traditional police power. *Vill. of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 389 (1926). Provided a zoning ordinance does not "trammel[] fundamental personal rights" or "draw[] upon inherently suspect distinctions such as race, religion, or alienage," the court must employ rational basis review in answering a facial Equal Protection or Due Process challenge. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). There is no allegation here that Salisbury's Occupancy Ordinance implicates any fundamental personal rights or draws any inherently suspect distinctions. Accordingly, for both its facial Due Process and Equal Protection challenge, Adams Housing must show the Occupancy Ordinance fails rational basis review.

Under the rational basis standard, the Occupancy Ordinance is presumed constitutional and must be upheld against an Equal Protection or Due Process challenge if there "is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)) (internal quotation marks omitted); *see also Vill. of Belle Terre v. Boras*, 416 U.S. 1, 4 (1974). The ordinance fails only if it "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense." *MLC Auto., LLC v. Town of S. Pines*, 532 F.3d 269, 281 (4th Cir. 2008) (quoting *Nectow v. City of Cambridge*, 277 U.S. 183, 187 (1928)). To defeat a statute through rational basis review, its opponent must "negate every conceivable basis that might support it." *Beach Commc'ns, Inc.*, 508 U.S. at 313.

In the present case, it is undisputed Salisbury has proffered at least one stated basis for the Occupancy Ordinance's enactment: reducing overcrowding in R-10 and other residence districts. (*Compare* ECF No. 1, ¶ 22 with ECF No. 17, p. 17). The question becomes whether over-occupancy is a legitimate basis rationally justifying the Occupancy Ordinance. Adams Housing argues there is "no correlation or rational relation between overcrowding and the requirement that no more than two unrelated people live together in the same dwelling, regardless of size or space." (ECF No. 1, ¶ 22). I need look no further than Supreme Court precedent to find Adams Housing's contention unavailing. In *Belle Terre*, an almost identical statute to the one at hand banned more than two unrelated persons from living together. 416 U.S.

at 1. The Court held that the ordinance there could serve to mitigate urban problems, including overcrowding, excessive traffic, parking problems, and noise.[4] *Id.* at 9.

Likewise, here, it does not require any stretch of imagination to recognize that the identical occupancy limit in Salisbury could serve to mitigate overcrowding. For example, by decreasing concentrated groups of unrelated persons, Salisbury could battle overcrowding by decreasing the number of cars competing for parking spots and road space. *See, e.g., Doe v. City of Butler, Pa.*, 892 F.2d 315, 321 (3d Cir. 1989) (holding part of an occupancy restriction valid because it was rationally related to density concerns like parking). Moreover, by reducing concentrated groups of unrelated persons, Salisbury could hope to make the single-family housing districts in question more amenable to families by reducing parties and other disturbances. Either rationale suffices as a conceivable causal link between the Occupancy Ordinance and its stated goal of reducing overcrowding.[5] The Occupancy Ordinance's prohibition on more than "two unrelated persons" living together survives rational basis review on this ground alone.

---

[4] Adams Housing attempts to distinguish *Belle Terre* by explaining that Salisbury and the town in *Belle Terre* are fundamentally different, arguing that it is impossible to create the "single-family fantasy land" that Salisbury allegedly desires. (ECF No. 18, p. 7 n.5). Adams Housing further argues that the Occupancy Ordinance has no use because "the majority of properties in District R-10 are already non-conforming rental properties . . . ." (ECF No. 1, ¶ 23). Adams Housing misses the point. While the Occupancy Ordinance may not be the most efficient way of achieving Salisbury's goals, under rational basis review, it is not the role of this Court to determine the efficacy of a city ordinance, only whether there is a conceivable legitimate basis for enacting it.

[5] Adams Housing argues that if Salisbury "has legitimate concerns about health, welfare, blight, and decay, these interests should be pursued through a rational, fair and less restrictive regulation." (ECF No. 18, p. 13). Again, this argument misunderstands rational basis review—when a legislature does not discriminate against a suspect class or affect a fundamental personal right, the judiciary does not require the legislature to pick the less restrictive or fairer of options. The case Adams Housing cites for this particular argument, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, is inapposite because there, the Court employed strict scrutiny. 508 U.S. 520, 531 (1993).

Accordingly, Adams Housing fails to show there is no conceivable basis for Salisbury's occupancy restriction on its face. Count I of Adams Housing's complaint is dismissed.

## II. Vagueness Challenge

In the third count of its complaint, Adams Housing requests a declaratory judgment holding the Occupancy Ordinance void for vagueness. I hold that, as-applied to Adams Housing, the Occupancy Ordinance is unconstitutionally vague.[6]

Under the Due Process Clause of the Fourteenth Amendment, a regulation imposing civil penalties "must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012); *see also Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926) ("a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law"). A law is unconstitutionally vague when: (1) it fails to provide sufficient notice so that ordinary people can understand what conduct is prohibited; or (2) it authorizes or even encourages arbitrary or discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (plurality opinion).

Adams Housing challenges the Occupancy Ordinance on two grounds. First, it alleges that the prohibition on more than "two unrelated persons" living together–and Salisbury's subsequent interpretation and enforcement of the prohibition–does not give Adams Housing or a person of ordinary intelligence fair notice of what conduct is required or forbidden. Second, Adams Housing shifts to a different section of the Occupancy Ordinance to challenge Salisbury's

---

[6] Because I hold the Occupancy Ordinance unconstitutionally vague as-applied, I do not reach Adams Housing's as-applied Equal Protection and Due Process claims in Count II of the Complaint. (*See* ECF No. 1, ¶¶ 27–32).

8

- definition of "functional family" as failing to give Adams Housing fair notice and placing "unfettered discretion in the hands of [Salisbury]." (ECF No. 1, ¶ 37).

I first find Adams Housing lacks the standing necessary to claim that Salisbury's definition of "functional family" is unconstitutionally vague. To establish standing in a federal court, a plaintiff must show: (1) an injury-in-fact, which is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical; (2) the government's conduct caused the injury; and (3) the injury is likely to be redressed if the court rules in the plaintiff's favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992). Adams Housing cannot show a concrete or particularized injury and thus, lacks standing.

Adams Housing cannot show a particularized or concrete injury because it has not followed the proper procedural channels for its tenants to be considered a "functional family." Although Adams Housing alleges it asked the HBAA to designate the tenants as a "functional family" (a request HBAA denied), Adams Housing admits it did not apply to the Salisbury Department of Neighborhood Services and Code Compliance for its tenants to be designated a "functional family." (ECF No. 17, Ex. 3, 19:1–9). By failing to do so, Adams Housing did not follow the proper procedure for its tenants to be considered as such. *See* Salisbury, Maryland, Municipal Code § 15.24.1620 (requiring property owners to apply to the Salisbury Department of Neighborhood Services and Code Compliance for a determination of whether they qualify as a "functional family").

Without an actual decision from the Department of Neighborhood Services and Code Compliance, Adams Housing's claims "clearly amount to no more than an abstract grievance." *Carpenter v. Barnhart*, No. 88-2578, 1990 WL 2314, at *4 (4th Cir. Jan. 16, 1990) (per curiam).

9

- Accordingly, Adams Housing's vagueness claim regarding the Occupancy Ordinance's definition of a "functional family" is dismissed.

I now address Adams Housing's vagueness challenges to the Occupancy Ordinance's cap on "two unrelated persons" living together.[7] Adams Housing alleges that the Occupancy Ordinance's cap is both facially vague and vague as-applied. First, I find that Adams Housing's facial challenge to the Occupancy Ordinance's cap on "two unrelated persons" living together is without merit. The language of the statute is clear–if there are more than two unrelated tenants, then the tenants cannot live in R-10. Accordingly, the text of the statute provides fair notice to an ordinary citizen and this claim is dismissed. I next consider whether Salisbury's enforcement and interpretation of the Occupancy Ordinance's cap on "two unrelated persons" living together rendered the Occupancy Ordinance unconstitutionally vague as-applied. I find it does.

The tenants here are two brothers and one unrelated friend; Salisbury found the tenants did not qualify as a family because they violated the Occupancy Ordinance's cap on two unrelated persons living together. Regardless of whether Salisbury defined relatedness by either: (1) adding the unrelated people living in the house; or (2) counting the number of unrelated relationships in the house, I find it mathematically impossible for the tenants here to constitute more than "two unrelated persons." First, if I count only the unrelated persons in the house, there is only one unrelated person in the house. Second, if I count the number of relationships

---

[7] Salisbury argues that "laws and ordinances which impose only civil penalties and which do not affect First Amendment rights survive constitutional scrutiny unless they are 'impermissibly vague' in **all** applications." (ECF No. 17, p. 36 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 489–99 [*sic*] (1982)) (emphasis in original)). This statement of law is incorrect-in *Hoffman*, the Supreme Court was considering a facial challenge. Here, Adams Housing not only alleges the Occupancy Ordinance's prohibition on more than "two unrelated persons" living together is unconstitutionally vague on its face, but also that it is unconstitutionally vague in its application. The latter claim does not require a showing that the law is vague in all applications. *See, e.g., Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048–51 (1991) (holding a regulation imposing civil penalties unconstitutionally vague as-applied).

10

(*i.e.* brother one-unrelated friend and brother two-unrelated friend), there are only two unrelated persons. Under either method, the tenants do not violate the Occupancy Ordinance's cap on two unrelated persons living together.

Salisbury argues that, according to the Occupancy Ordinance, there are only three groups of people allowed to live in R-10 dwelling units: families related by blood, two persons who are "not so related," and groups qualifying for an accommodation. (*See, e.g.*, ECF No. 17, pp. 14–15, 37). According to Salisbury, because the tenants must qualify as one of the three groups, the groups cannot mix. I agree with Salisbury's premise that the tenants must fit into one of the three groups; however, under the plain language of the statute, I cannot reach Salisbury's conclusion. *United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988) ("[W]hen the terms of a statute are clear, its language is conclusive and courts are not free to replace that clear language with an unenacted legislative intent.") (internal quotation marks omitted). The Occupancy Code contains no prohibition–explicit or otherwise–on the mixing of unrelated and related persons; so long as the tenants do not exceed the cap of two unrelated persons, they qualify as a "family." The language of § 15.24.490(1)(b) is unambiguous—there is simply no affirmative requirement, as Salisbury claims, that all tenants be unrelated to qualify as a family.[8]

Salisbury argues its interpretation of the statute best comports with the Occupancy Ordinance's purpose and scheme. This argument is without merit. As both parties agree, one of the primary purposes of the statute is to prevent overcrowding. The Occupancy Ordinance includes a provision permitting families to live with an unlimited number of domestic servants.

---

[8] Accepting Salisbury's interpretation of the Occupancy Ordinance may lead to additional constitutional infirmity. Salisbury points to no other zoning ordinance in the country containing a flat prohibition on groups of related people and a single unrelated person living together. The idea that an empty nester couple–in need of spare cash–cannot rent out a spare room to an unrelated friend or a single college student borders on absurdity and may implicate further Due Process concerns.

Salisbury, Maryland, Municipal Code, § 15.24.490(2)(b). Allowing one unrelated person to live with a group of related persons has the same numerical effect on overcrowding as does allowing a domestic servant to live with a group of related persons. Indeed, in the case of domestic servants, overcrowding is potentially *more* exacerbated because there is no cap on the number of domestic servants living with a family. The Occupancy Ordinance's domestic servant exception shows that the Salisbury legislature was willing to balance its goal of mitigating overcrowding with other considerations, such as the convenience of its citizenry. Salisbury proffers no evidence, from either the text or the legislative history of the Occupancy Ordinance, which shows Salisbury's legislature intended to prohibit unrelated and related persons from cohabitating. Accordingly, Salisbury's legislative intent argument proves unavailing.

Adams Housing also alleges that Salisbury's enforcement and interpretation of the Occupancy Ordinance's prohibition on no more than "two unrelated persons" living together is inconsistent. (*See, e.g.*, ECF No. 15, ¶¶ 31, 36). Specifically, Adams Housing alleges that, in other situations involving the same tenant composition (*i.e.*, two relatives and one unrelated person), Salisbury found there was no violation of the Occupancy Ordinance. *Id.* at ¶ 36. The Supreme Court has held a government agency's enforcement of a regulation unconstitutionally vague when it departed from a previously held policy without providing notice. *Fox Television Stations, Inc.*, 132 S. Ct. at 2318. Similarly, here, Adams Housing alleges Salisbury's decision in the present case was inconsistent with previous decisions; thus, Adams Housing argues it did not have fair notice of what the Occupancy Ordinance required. (ECF No. 1, ¶ 36). Moreover, according to the facts alleged, there was no guidance or announcement that the Occupancy Ordinance would be enforced as it was against Adams Housing. Salisbury argues Adams Housing should have simply asked for guidance on the contested provisions. (ECF No. 17, p.

38). This argument is unpersuasive; given Salisbury's previous inconsistent decisions, there is no guarantee Adams Housing would have received accurate guidance.

Salisbury's inconsistent decisions regarding the definition of family as no more than "two unrelated persons" living together, combined with its confusing interpretation of the provision, compel this court to declare Salisbury's interpretation and enforcement of the Occupancy Ordinance unconstitutionally vague as-applied to Adams Housing.

### III. Tortious Interference with Contract Claim

In Count IV of its complaint, Adams Housing brings a state claim against Salisbury for tortious interference with contract. Specifically, Adams Housing alleges Salisbury tortiously interfered with its leases by: (1) enacting, interpreting, and enforcing the Occupancy Ordinance; (2) interpreting the Occupancy Ordinance's "two unrelated persons" provision arbitrarily against Adams Housing; (3) inspecting Adams Housing properties to determine whether a "functional family" existed; and (4) after Adams Housing made it known it intended to challenge Salisbury's enforcement of the Occupancy Ordinance, Salisbury's six "retaliatory inspections" against Adams Housing properties.

Since all events giving rise to Adams Housing's tort claim occurred in Maryland, Maryland law applies. Under Maryland law, the Local Government Torts Claims Act ("LGTCA") governs non-constitutional tort claims against local governments like Salisbury.[9] The LGTCA preserves the governmental immunity of local governments–to that end, under the LGTCA, "a plaintiff may not sue a local government directly . . . but must sue, instead, the [government] employee." *Edwards v. Mayor & City Council of Baltimore*, 933 A.2d 495, 502 (Md. App. 2007) (internal quotations and citations omitted); *see also Paulone v. City of*

---

[9] Because Salisbury is a municipal corporation, it is covered by the LGTCA. Md. Code Ann., Cts. & Jud. Proc. § 5-301 (d)(5).

13

*Frederick*, 787 F. Supp. 2d 360, 378 (D. Md. 2011) (dismissing a suit against a city on government immunity grounds under the LGTCA); *Kelly v. Town of Ocean City, Md.*, No. 09-2396, 2010 WL 4789141, at *2 (D. Md. Nov. 16, 2010) (holding the same).

Because Adams Housing brings a non-constitutional tort claim against Salisbury, instead of an individual employee, Count IV is dismissed.

## CONCLUSION

For the aforementioned reasons, I declare Salisbury's interpretation and enforcement of the Occupancy Ordinance unconstitutionally vague as-applied to Adams Housing. I do not reach Salisbury's as-applied Due Process and Equal Protection Claim (Count II). Adams Housing's facial constitutional challenge (Count I) and tortious interference with contract claim (Count IV) are dismissed.

November 30, 2015
Date

/s/ J. Frederick Motz
J. Frederick Motz
United States District Judge

BY _____ DEPUTY
AT BALTIMORE
CLERK'S OFFICE
2015 NOV 30 AM 11:50
U.S. DISTRICT COURT
DISTRICT OF
FILED

14